UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DAVID HUBER, DEBRA HUBER,

        Plaintiffs,

    v.

                                  Case No. 2:24-cv-1093-KCD-NPM

AMWINS ACCESS INSURANCE
SERVICES, LLC,

        Defendant.

_____/

## ORDER

In September 2022, Plaintiffs David and Debra Huber needed excess insurance coverage to fill the gaps in their primary flood policy. Their retail agent, Willis Personal Lines, LLC, gathered the necessary paperwork and sent a "request to bind" to Defendant Amwins Access Insurance Services, LLC, a wholesale broker. (Doc. 22 ¶ 9.)[1] Apparently, all Amwins had to do was forward that application to the carrier to finalize the policy. But Amwins waited nearly two days to hit send. By the time it finally submitted the request, a major storm was churning toward the Florida coast, the carrier had instituted a moratorium on new policies, and the Hubers were out of luck. Days later, Hurricane Ian struck, causing nearly a million dollars in flood damage to the Hubers' property. (*Id.* ¶ 18.)

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

The Hubers now sue Amwins for negligence and breach of fiduciary duty. (*Id.* ¶¶ 27-41.) Amwins has moved for summary judgment, arguing it was merely a paper-pushing middleman that owed the Hubers no duty whatsoever. (Doc. 31.)

That argument is only half right. The Court agrees that a wholesale broker does not owe a fiduciary duty—the highest standard of loyalty and care under the law—to a buyer it never spoke to, contracted with, or advised. Amwins is entitled to summary judgment on that claim. But a middleman who accepts an order to bind coverage still has a basic, common-law duty to act with reasonable care and not to dawdle unreasonably. Whether Amwins' delay was negligent under the circumstances is a classic question of fact for a jury. So Amwins' motion is **GRANTED in part** and **DENIED in part**.

## I. Background

Here are the relevant undisputed facts, with any disputes noted as they arise. The Hubers own a home in Naples, Florida. They kept flood insurance that covered only part of the potential risk, so they had their agent—Willis—contact a wholesale broker—Amwins—to procure additional flood coverage.

Things moved quickly at first. Within a few days, the Hubers chose the quote they wanted, filled out an application, and received an email from Amwins confirming that their "order to bind" was received and the policy was

being procured. The timestamp on that email was 3:49 PM on Wednesday. (Doc. 31 ¶ 31.)

But Amwins did not pass the baton. Instead, it waited until Friday at 11:01 AM to send the application to the carrier, TM Highland. (Doc. 32-8 at 145.)[2] That delay proved fatal to coverage. TM Highland rejected the application, explaining that a state-wide moratorium had just taken effect. The carrier was explicit: "Had we received [the application] on Wednesday or Thursday then there would not have been an issue at all." (Doc. 32-8 at 138.)

Amwins relayed the "bad news" to Willis:

> We were unable to get the bind order to the carrier until today … and they advised they couldn't issue due to the moratorium.  We pointed out that you originally sent this in on Wednesday but we were unable to get it to them until today.

(Doc. 32-8 at 129.) Five days later, that bad news compounded when Hurricane Ian barreled through, flooding the Hubers' property.

As mentioned, the Hubers now sue Amwins for negligence and breach of fiduciary duty. Their theory is straightforward: Amwins took a day too long to forward their application to the insurance carrier. If Amwins had just submitted the application on time, the moratorium wouldn't have been active yet, and the Hubers would have had the insurance needed. Amwins seeks

---

[2] For ease of reference, the Court cites to the page numbers generated by its electronic filing system for all exhibits.

summary judgment on both claims. Its defense is equally straightforward: as a wholesale middleman who never spoke directly to the Hubers, it owed them "no duty" at all. (Doc. 31 at 2.)

## II. Legal Standard

"Summary judgment is appropriate when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). "And a fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674, at *4 (M.D. Fla. July 28, 2025).

"The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at *2 (M.D. Fla. Sept. 2, 2025).

4

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). This requires the nonmovant to "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Alexander as trustee of Franklin Pharmacy, LLC v. Aaron*, No. 3:15-CV-1314-AKK, 2017 WL 11437294, at *1 (N.D. Ala. June 1, 2017); *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 177 (5th Cir. 2016). "All submitted evidence is viewed in the light most favorable to the nonmovant and all justifiable inferences are drawn in its favor." *Harris v. Wells Fargo Bank N.A.*, No. 24-11138, 2025 WL 1860290, at *1 (11th Cir. July 7, 2025).

## III. Discussion

Before touching the merits, the parties first spar over which state's law governs the claims. Amwins pushes for Maryland, noting that the retail agent, the Hubers' personal counsel, and the mailing address listed on the application were all located in Maryland. (Doc. 31 at 12-16.) The Hubers, meanwhile, point to the physical reality: they are Florida residents, the home to be insured is in

Florida, and the flood damage actually occurred in Florida. (Doc. 32 at 11-13.)[3] But we can skip that fight entirely, at least for now. Both Maryland and Florida law recognize claims for negligence and breach of fiduciary duty, and both dictate the same result. The Court addresses each claim separately below.

**Count I—Negligence**

To establish negligence, a plaintiff must show: "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *State v. Young*, 265 Md. App. 1, 32 (2025); *see also Schramm v. Adams Homes of Nw. Fla., Inc.*, 414 So. 3d 352, 355 (Fla. Dist. Ct. App. 2025).

The fight here is over duty. Amwins argues it cannot be liable because it was essentially a stranger to the Hubers. But the law in both Florida and Maryland does not let brokers off the hook quite that easily. In Florida, if a broker "undertakes to obtain insurance coverage for another person and fails to do so," he can be held liable for the fallout. *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 654 (Fla. Dist. Ct. App. 2006). Maryland law says much the same thing: when a broker is hired to get a policy and fails to deliver, "an action may lie against the broker, either in contract or in tort." *Goucher Coll. v. Cont'l Cas.*

---

[3] The Hubers' brief is not paginated, so the Court refers to the page numbers generated by its electronic filing system.

*Co.*, 541 F. Supp. 3d 642, 649 (D. Md. 2021). In other words, if a broker takes on the job of securing coverage, they must actually do the job—or answer for it in court.

Amwins stresses that the existence of a duty is a question of law, and it "arises only where the defendant is required to conform to a particular standard of conduct for the plaintiff's protection." (Doc. 31 at 20.) No argument there. But applying that rule to these facts does not get Amwins where it wants to go. The record shows that Amwins did not just stand on the sidelines. It accepted an "order to bind" for the Hubers and confirmed that it had "started the issuance process." (*Id.* ¶ 32.) At that moment, Amwins was no longer a bystander. It had undertaken a specific task, and under the law, it was bound to handle that request—and to do it without dropping the ball. This is not a novel proposition. To the contrary, it is "generally accepted" that when a broker is hired to get insurance and fails to deliver, that broker stands liable. *Int'l Bhd. Of Teamsters v. Willis Corroon Corp. Of Maryland*, 369 Md. 724, 737 (2002); *see also Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 83 (2002) ("[I]nsurance agents and brokers clearly owe a professional's duty to the insured.").

Amwins tries to wiggle out from under this duty by emphasizing the silence between itself and the Hubers. Because the two never spoke directly— and because Amwins only dealt with the retail agent Willis—Amwins argues

it was effectively a stranger to any legal obligation. (Doc. 31 at 20.) But the law of agency is not so easily dodged. Amwins knew exactly whose property it was helping to insure; the Hubers' names were right on the application. Willis also made it clear that it was speaking for the Hubers, noting in emails to Amwins that "Dr. Huber would like to move forward with the excess flood [policy]." (Doc. 32-2 at 16-17.) Amwins itself recognized this relationship, referring to the client as "Dr. Huber," requesting "a copy of his current primary flood dec," and instructing Willis to "be sure to include the quote he wants." (*Id.*) These communications show that Amwins knew exactly who it was working for, making its status as a middleman no shield against a duty of care. *See United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 498 (4th Cir. 1998) (rejecting the same arguments made here under Maryland law, explaining that "a broker acting as a middleman . . . does not refute the general principle that just such a relationship can be an agency relationship").

Amwins also points to *Brown v. Ashcraft Assocs. Ins. Agency, Inc.* as its silver bullet. No. CV RDB-05-507, 2008 WL 11363364, at *6 (D. Md. Aug. 7, 2008). That case allegedly draws a bright line: a wholesale broker is shielded from negligence claims "absent privity, an express undertaking, or ongoing direct relationship." (Doc. 31 at 17.) And according to Amwins, none of those facts are present here.

8

To start, *Brown* is a bit of a legal outlier. It has never been cited by another court in the nearly two decades since it was handed down. But even if it is more than a one-off, the facts here still don't line up. In *Brown*, the brokers lived in separate silos and never even spoke to each other's clients. Amwins, by contrast, was right in the thick of it—referring to Dr. Huber by name, chasing his records, and confirming the "issuance process" had begun. Once a broker steps out of the shadows to handle a specific job for a known client, it can't claim to be an invisible middleman. *See United Capitol Ins. Co.*, 155 F.3d at 498.

To be sure, Amwins did not play the role of a trusted advisor or a personal confidant (more on that later). But Amwins *was* handed the baton. It was given the authority—and it took on the responsibility—to secure the insurance the Hubers had already selected. By stepping into that role and agreeing to get the job done, Amwins created a duty of care that the law recognizes.

The Hubers claim that sitting on a bind order for two days—especially with a storm bearing down—was careless. Amwins apparently counters that a two-day turnaround is perfectly standard and reasonable. But that is exactly the kind of dispute this Court cannot resolve on summary judgment. The law does not hand judges a stopwatch to time exactly how long an insurance broker is allowed to take to process an application. Whether a two-day delay was a

9

normal administrative timeframe or an unacceptable lag under the circumstances is a classic question of fact. It requires weighing the evidence, understanding the industry's standard practices, and deciding what a reasonably prudent broker would have done when faced with that exact situation. That is a job for a jury, not a judge. Summary judgment is therefore denied for Count I.

### Count II—Breach of Fiduciary Duty

Breach of fiduciary duty has three general elements: the existence of a fiduciary duty, a breach of that duty, and damages caused by the breach. *See Plank v. Cherneski*, 469 Md. 548, 599 (2020); *Brouwer v. Wyndham Vacation Resorts, Inc.*, 336 So. 3d 372, 373 (Fla. Dist. Ct. App. 2022). Like above, the whole ballgame comes down to step one—the duty. Amwins concedes it acted as a broker on the deal, but it draws a hard line at being called a fiduciary. The Court agrees.

Under Maryland law, "fiduciary relationships can be created by common law, by statute, or by contract, and can have different characteristics." *Plank*, 469 Md. at 598. Florida operates much the same way, recognizing that "[f]iduciary relationships are either expressly [created by contract or through legal proceedings] or impliedly created." *Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017). But no matter the state or the origin story, the real catalyst is always the same: "trust" or a "special

10

confidence." *See National Association of State Veterans Homes*, 2025 WL 1191789, at *6 ("A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing the confidence."); *Sch. Bd. of Osceola Cnty., Fla. v. Gallagher Benefit Servs., Inc.*, No. 6:21-CV-1979-ACC-LHP, 2022 WL 19914514, at *6 (M.D. Fla. June 22, 2022) ("To plead an implied fiduciary relationship, the insured must allege facts showing that it placed trust in the insurance broker and that the broker accepted the insured's trust."). Or to put it more plainly, "[i]f a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)

There is no allegation of a contract between the Hubers and Amwins. Nor have the parties cited a statute that creates a fiduciary duty between these parties. We therefore have to look closely at the relationship they actually built. "Fiduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017); *see also Nat'l Ass'n of State Veterans Homes v. Donor*, No. 23-CV-02787-LWW, 2025 WL 1191789, at *6 (D. Md. Apr. 24, 2025). "[T]here is no

11

one-size fits all breach of fiduciary tort that encompasses all types of relationships." *Plank*, 469 Md. at 598; *see also Smith v. Casey*, No. 1:12-CV-23795-UU, 2014 WL 11878422, at *6 (S.D. Fla. Oct. 29, 2014).

Absent binding precedent (which neither side has offered), this Court is not prepared to say that an insurance broker automatically becomes a fiduciary simply by taking on the job of procuring insurance as a middleman. *See Johnson*, 687 F. App'x at 831. That kind of everyday, arm's-length business arrangement simply lacks the earmarks of trust and loyalty that a true fiduciary bond demands. *See Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 70 (2015) ("[A]ll fiduciary relationships are confidential relationships . . . but not all confidential relationships are fiduciary relationships[.]").

Looking at the record here, Amwins was playing exactly that middleman role. It never met the Hubers, never reviewed their financial portfolios, and never offered a word of advice about their overall risk exposure. *Cf. Randolph v. Mitchell*, 677 So. 2d 976, 978 (Fla. Dist. Ct. App. 1996). And the Hubers point to no evidence showing that they relied on Amwins for guidance. By the time Amwins entered the picture, the Hubers had already picked out their coverage. Amwins simply procured the quotes, received the go-ahead from the retail agent, and started processing the paperwork to get that exact policy bound. (*See* Doc. 32 ¶¶ 6-10.) That is the work of an order-taker, not a confidant.

Because Amwins did nothing more than facilitate a specific, arm's-length transaction, the Court agrees it never assumed the heavy mantle of a fiduciary. *See Thompson*, 443 Md. at 72, *Watkins v. NCNB Nat. Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. Dist. Ct. App. 1993) ("To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."). Taking on a bind order might trigger a basic duty of reasonable care—as discussed above—but it does not magically create a strict fiduciary obligation. And on the evidence presented, no reasonable jury could conclude otherwise. Summary judgment is thus granted as to Count II.

## IV. Conclusion

A broker who takes on a specific bind order cannot claim it owes no duty of care, meaning a jury must decide if Amwins was negligent. However, because Amwins acted strictly as an arm's-length middleman rather than a trusted advisor, it never owed the Hubers a fiduciary duty. Accordingly, Amwins's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. The negligence claim will proceed to trial.

**ORDERED** in Fort Myers, Florida on March 6, 2026.

Kyle C. Dudek
United States District Judge

13